Henry Proesel, Appellant, v. Myers Publishing Company, and Edward F. Ream, Jr., Appellees.

Gen. No. 47,614.

First District, First Division.
February 29, 1960.
Rehearing denied March 28, 1960.
Released for publication March 29, 1960.

502

James A. Dooley, of Chicago, for plaintiff-appellant.

Kurt J. Salomon, of Chicago, for Myers Publishing Company, Kirkland, Ellis, Hodson, Chaffetz, and

Masters, and Otto J. Rouse, all of Chicago (Howard Ellis, Don H. Reuben, and James E. Beaver, of counsel) for Edward F. Ream, Jr., defendants-appellees.

JUSTICE McCORMICK delivered the opinion of the court.

This is an appeal from an order of the Superior Court of Cook County entered July 16, 1958, sustaining defendants' motions to strike and dismiss plaintiff's second amended complaint.

In the second amended complaint the plaintiff alleges that he for many years has been and is now president of the Village of Lincolnwood, Illinois, and president of the Bank of Lincolnwood, in the Village of Lincolnwood; that he has had the good opinion and esteem of the residents of said community and has established among the people of the community an excellent reputation for business skill and ability, for honesty, integrity and good character; and that defendant Myers Publishing Co. (hereafter referred to as "Myers") is the owner, printer and publisher of "The Life of Niles Township," a newspaper circulating generally in Lincolnwood, Skokie, and other suburbs north of the City of Chicago, and in the City of Chicago, Illinois.

Plaintiff further alleges:

"3. That on August 23, 1956, the defendant, Myers Publishing Co., a corporation, did print, publish, circulate and distribute copies of the newspaper, 'The Life of Niles Township,' containing on page 1 thereof an article with a large four-column headline entitled 'Ream Cites Need for Audit in Lincolnwood;' a sub-caption 'Says Proesel Using Flood as Cover-up' in smaller but boldface type; and another sub-caption 'Tells What Happened to $100,000 of Water Bond Money.' That said article was continued on page 2 of Section 2 of said newspaper. That said article, in

addition to the headlines and sub-headlines quoted above contained, among others, the following statements:

"'Ream was one of the Lincolnwood leaders who objected to the method proposed to finance combined sewer and waterworks construction, and in two referendums defeated the Proesel administration plan.'

"'The poor judgment exhibited by Proesel and some of his cohorts, and their inept manner of handling some recent personnel and zoning problems have opened the eyes of many of the villagers and brought storms of criticism on the administration.'

"'The sewer project was never offered separately, although part of the Morse Avenue sewer was constructed apparently by diverting *funds raised by selling more bonds than were necessary* for waterworks construction.' (Italics supplied.)

"'*Nearly $100,000.00 in bonds to be paid for by high water rates, were sold over and above the cost of the waterworks set up by the ordinance.*' (Italics contained in newspaper article.)

"'*Approximately $50,000.00 of this money was used to enlarge or replace the water main in Crawford Avenue, to cover up an error in original selection of the pumping station site.*' (Italics contained in newspaper article.)

"'*The remainder of the money apparently went into the $90,000 Morse Avenue sewer back of the new Ditto plant. Ditto, and perhaps others, also paid for part of this sewer, since for their convenience, other sewers were closed off. The real story will probably never be known until we get an independent audit of the Village finances.*' (Italics contained in newspaper article.)

505

" 'Proesel has since stymied further construction on Morse Avenue, though home-owner groups have petitioned him to take action. One ordinance for its construction presented in the "back room" to the Board of Trustees nearly one year ago was mysteriously withdrawn.'

" 'Today apparently only Proesel knows whether Lincolnwood will ever get the Morse Avenue interceptor.'

"and again,

" 'The trustees followed cues with Proesel reading years-old newspaper clippings and letters directly to the audience.'

" 'Henry Proesel, President of the Board . . . .'

" 'Proesel Heads the administration . . . .' "

The plaintiff states in his complaint that the article was a statement which had been submitted to the newspaper by the defendant Edward F. Ream, Jr., (hereafter referred to as "Ream") for the purpose of publication. The plaintiff further alleges:

"6. That on August 30, 1956, the defendant corporation published in its newspaper 'The Life of Niles Township' an article entitled 'For Newcomers to Lincolnwood,' in large headlines across three columns, 'Ream Explains Why Voters Said "No" to Sewer Plan.' That said article consisted almost entirely of a 'statement' submitted to the defendant, Myers Publishing Co., by the defendant, Edward F. Ream, Jr. That among other things, said article contained the following statements:

" 'Ditto offered the Village $35,000 to reroute this Kimball Avenue sewer eastward on Morse direct to McCormick Boulevard and the canal, thus taking it off their property. . . .'

506

 

" 'Existence of the $35,000 kitty from Ditto was denied at the time by the Administration and no allowance was made for it in figuring the proposed bond issue.'

" 'In September, 1953, Proesel decided to try the bond issue again on the identical basis on which it had just been defeated.'

" 'Proesel apparently had decided that if the Villagers didn't want the sewer on his terms, they wouldn't get it at all.'

" 'By quietly diverting money from the waterworks program and by finally having to use the $35,000 Ditto fund, the Kimball Avenue sewer was rerouted by constructing a portion of the Proposed Morse Avenue interceptor from Kimball Avenue east to the canal.'

" '*On or about September, 1955, Proesel proposed an ordinance to the Board of Trustees . . . this proposal was of the "back room" variety and was not made publicly.*' (Italics from newspaper.)

" 'Construction might have started months ago if the Proesel administration had not chosen to withhold the ordinance.' "

Copies of both articles were attached to the complaint as exhibits and made a part of the complaint.

In his complaint the plaintiff further alleges that the articles were false.

Defendant Myers filed a motion to dismiss alleging, among other things, that the articles are not libelous *per se;* that there are no facts alleged which say that the statements concerning the plaintiff were maliciously made; that the publications complained of are not actionable since they dealt with the report of defendant Ream, one of the trustees of the Village of Lincolnwood, about conditions and matters with refer-

507

ence to the sewerage and water systems in the village, and that hence the articles were fair comment and criticism. Defendant Ream filed a motion to strike in which he set up, among other things, that the language in question is not libelous *per se;* that it is comment on matters of public interest; and that it affirmatively appears from the face of the complaint that the defendant Ream is not the author of any of the headlines.

The plaintiff did not plead special damages nor any facts showing financial injury. No innuendo was pleaded, and the plaintiff has elected to stand upon his interpretation of the articles as being libelous upon their face since they charge plaintiff with diverting public funds from the purpose for which they were appropriated, which he alleges is a crime, and for having attacked plaintiff as a public official charging him with dishonesty, corruption in office and want of integrity.

The question before us is as to whether the trial court erred in finding as a matter of law that the plaintiff's second amended complaint failed to state a cause of action based upon its finding that the articles were not libelous *per se.*

In Ogren v. Rockford Star Printing Co., 288 Ill. 405, the court says:

"Section 177 of our Criminal Code defines libel as a malicious defamation, expressed by printing or by signs or pictures, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue or reputation or publish the natural defects of one who is alive, and thereby to expose him to public hatred, contempt, ridicule, or financial injury. Under such a statute it is not necessary to charge one with a crime to make the charge libelous *per se.* Cerveny v. Chicago Daily News Co., 139 Ill.

508

345; Dowie v. Priddle, 216 Ill. 553; People v. Fuller, 238 Ill. 116."

■ In considering the articles they must be construed by the court in the sense which readers of common and reasonable understanding would ascribe to them (Parmelee v. Hearst Pub. Co., Inc., 341 Ill. App. 339); or, as was stated in LaGrange Press v. Citizen Pub. Co., 252 Ill. App. 482:

"In determining this [if the published article is libelous *per se*], the words must be taken in the sense which readers of common and reasonable understanding would ascribe to them, that is, in their ordinary and common acceptation. 'All the words in the article are to be considered, and when they are all considered together, the question is, how would they be understood by men of common and reasonable understanding?' People v. Fuller, 238 Ill. 116; Nelson v. Borchenius, 52 Ill. 236; Barnes v. Hamon, 71 Ill. 609; Ransom v. McCurley, 140 Ill. 626."

■ ■ When the language is unambiguous and capable of only one meaning it presents a question of law to be determined by the court as to whether or not it is libelous *per se,* and if the court concludes that the statement can in no sense be libelous then he should dismiss the complaint. On the other hand, if the article is capable of two meanings, one libelous and the other not, then the meaning of the article must be submitted to a jury. Spanel v. Pegler, 160 F.2d 619 (7th Cir.); Beauharnais v. Pittsburgh Courier Publishing Co., 243 F.2d 705 (7th Cir.); Clark v. Tribune Co., 11 Ill.App.2d 420; Tiernan v. East Shore Newspapers, 1 Ill.App.2d 150; Latimer v. Chicago Daily News, Inc., 330 Ill. App. 295. "It is only when the court can say that the words are not reasonably capable of any defamatory meaning and cannot reasonably be understood in any defamatory sense

that the court can rule as a matter of law that they are not defamatory." Estill v. Hearst Publishing Co., Inc., 186 F.2d 1017, (7th Cir.). In Ogren v. Rockford Star Printing Co., supra, the court says:

"Where the words are ambiguous or equivocal in meaning, the question of the meaning to be ascribed to them is for the jury, although the question as to whether or not any particular meaning is libelous is for the court. Where there is a controversy as to whether or not words were spoken of and concerning the plaintiff, the question whether they were so spoken is for the jury. (Ball v. Evening American Publishing Co., 237 Ill. 592.)"

Also see John v. Tribune Co., 19 Ill.App.2d 547. Words alleged to be libelous will be considered to be innocent if they are reasonably susceptible of such construction. Judge v. Rockford Memorial Hospital, 17 Ill.App.2d 365.

We will first consider the question as to whether or not the articles charge the commission of a crime. ■ ■ Where the alleged libel charges the commission of a crime the charge need not meet the same technical requirements as are necessary to an indictment, but words fairly imputing a crime are sufficiently libelous to be actionable. Zurawski v. Dziennik Zjednoczenia Publishing Corp., 286 Ill. App. 106. The plaintiff argues that the articles charge a crime since they falsely accuse the plaintiff of diverting funds provided for the waterworks to construct a portion of the Morse Avenue interceptor sewer, and cites paragraph 449 of chapter 38, Illinois Revised Statutes, which provides that any person holding any public office "who shall be guilty of diverting any public money from the use or purpose for which it may have been appropriated, or set apart by or under authority of law, or who shall be guilty of contracting directly or indirectly, for the expenditure of a greater sum

or amount of money than may have been, at the time of making the contracts, appropriated or set apart by law" may be fined and removed from office. Plaintiff argues that the word "divert" flatly charges the commission of a crime, although perhaps not in technical terms, and is therefore not susceptible to innocent construction. While there are no Illinois cases which, with respect to this particular matter, interpret the section of the statute cited by the plaintiff, we do not think that the diversion of funds appropriated from one public purpose to another public purpose, standing alone, could properly be construed as bringing the public officer involved within the scope of the statute. Nor does the language of the headlines, read in connection with the articles, prima facie charge plaintiff with the commission of a crime. Reading the articles in the sense of the ordinary general reader in the community, it is unreasonable to assume that such reader would believe that the plaintiff was accused of committing a crime, and if the court's ruling depended solely upon this question the court properly dismissed the complaint.

Plaintiff also argues, however, that the articles are libelous *per se* since the plaintiff holds a public office and the articles carry an imputation of unfitness and want of capacity to perform the duties thereof, lack of integrity and dereliction of duty.

In 53 C. J. S., Libel and Slander, sec. 32, it is stated:

". . . any language imputing want of integrity, a lack of due qualification, or a dereliction of duty to an officer or employee is actionable per se, whether it is spoken or written.

"It is not necessary that the words should contain an imputation on plaintiff as an individual which would be actionable apart from the question of his business or profession, and words injurious in this respect may be actionable, even though they might not be so if said

of a person simply in his individual capacity. Words need not hold one up to hatred, ridicule, or contempt, or accuse him of fraud or disonesty, in order to libel him in his business or calling."

The same rule was stated in 36 C. J., Libel and Slander, sec. 69, (p. 1180), and it is quoted with approval in Cavanagh v. Elliott, 270 Ill. App. 21.

In 33 I. L. P., Slander and Libel, sec. 26, it is said: "Any language which imputes want of integrity, a lack of due qualification, or a dereliction of duty to an officer or employee, whether it is written or spoken, is actionable per se."

■ ■ In applying those rules many cases in Illinois have pointed out the kind of statement which is libelous *per se*. "The general rule in relation to the speaking of words of one in a particular calling may be stated as follows: any words spoken of such a person in his office, trade, profession, or business, which tend to impair his credit, or charge him with fraud, or indirect dealings, or with *incapacity*, and that tend to injure him in his trade, profession, or business, are actionable, without proof of special damage. . . . [Citing cases.]" Clifford v. Cochrane, 10 Ill. App. 570, 574. This statement is quoted with approval in Cavanagh v. Elliott, supra, at p. 26. " 'Defamatory words falsely spoken or written of a person, which impute to him unfitness to perform the duties of an office or employment of profit, or the want of integrity in the discharge of the duties of such an office or employment, are actionable in themselves . . .' ", Creitz v. Bennett, 273 Ill. App. 88, 96, quoted with approval in Hotz v. Alton Telegraph Printing Co., 324 Ill. App. 1. It is also the law that words written or printed are libelous and actionable if they tend to bring the plaintiff into public hatred, contempt or ridicule, even though the same words, if spoken, would not have been actionable. Cerveny v. Chicago Daily News Co.,

512

139 Ill. 345; Herrick v. Tribune Co., 108 Ill. App. 244; White v. Bourquin, 204 Ill. App. 83, 93. See also Lyman v. New England Newspaper Pub. Co., 190 N. E. 542, 543 (Mass.).

The question which the court here also has to determine is as to whether or not the articles, as read by readers of common and reasonable understanding, could have a defamatory meaning assigned to them, and if the court finds that the articles are capable of a libelous meaning but also capable of another meaning, then the matter is one for a jury to determine.

■ From the articles, without considering the headlines, it would seem that they could be construed as attacking the capacity, integrity and fitness of plaintiff as president of the Village of Lincolnwood, as well as imputing to him a dereliction of duty. The articles state that the defendant Ream objected to plaintiff's proposed method of financing combined sewer and waterworks construction and in two referenda the voters defeated those propositions; that plaintiff, after his proposal had been rejected by the people, constructed a sewer on Morse Avenue, the funds for which construction were obtained from $100,000 in bonds sold for waterworks construction and that that amount was to be paid for by high water rates; that approximately $50,000 of the money was used to enlarge or replace water mains in Crawford Avenue to cover up an error in the original selection of the pumping station site; that the Kimball Avenue sewer was rerouted eastward on Morse Avenue to McCormick Boulevard and the canal in order to take it off the property of the Ditto Company and keep it from running under their proposed new building, even though the better location for the Morse Avenue interceptor would have been on Touhy Avenue; that the plaintiff quietly diverted money from the waterworks program to construct this sewer; that this was

done for the convenience of the Ditto Company; that the Ditto Company had offered the village $35,000 for rerouting the sewer; that this fact had been denied by the plaintiff; that at the time when the proposed bond issue was figured no allowance was made for it, however plaintiff finally had to use the fund to construct a portion of the Morse Avenue sewer; that plaintiff has stymied further construction of sewers on Morse Avenue, although homeowner groups have petitioned him to take action; that he did about a year before the publication of the article present an ordinance to the board of trustees which was of the "back room" variety, not made publicly and then was mysteriously withdrawn; that at the time of the publication of the articles only plaintiff knew whether Lincolnwood would ever get the Morse Avenue sewer and that he has apparently decided that if the village did not want the sewer on his terms it would not get it at all; that construction might have started months before if plaintiff had not withdrawn the ordinance; that the real story with reference to the construction of the Morse Avenue sewer will probably never be known until there is an independent audit of the village finances.

■ Considering the articles alone, without the headlines, it is apparent that a substantial number of people in the community, whether or not all so-called "right-thinking" people would take the same view, could consider that the imputations which could be drawn from the articles would demean the plaintiff. That would be sufficient to permit the jury to pass upon the question. Herrmann v. Newark Morning Ledger Co., 138 A.2d 61. The sense of the article is that plaintiff, who holds his office as a public trust, after his proposed method of financing sewer construction as a part of the waterworks program, including the higher rate of taxation, had been defeated, then by an undercover movement clandestinely obtained

the same result by selling $100,000 worth of bonds unnecessary for waterworks construction and diverting $50,000 of it to the construction of a sewer, which was constructed for the convenience of the Ditto plant, secretly using $35,000 of Ditto money to construct the sewer, which money Ditto was paying to have the sewer constructed for their convenience without any consideration of the other village residents; in other words, that the plaintiff, as head of and in control of the city administration, was derelict in his duty and was influenced in his actions by reasons other than public need and convenience. It would seem that the statements are removed but a hair's breadth from being libelous as a matter of law, in imputing to plaintiff want of integrity, lack of qualification, and a dereliction of duty in office. Nor does it appear that the court could under any circumstances give any innocent construction to the articles. Defendant Ream in his brief states: "When the innocent construction rule is joined to the fact that the publication was political in nature, we submit it is manifest Proesel fails to state a cause of action." We know of no case holding that a statement otherwise libelous would not be so because it was "political in nature." These statements were not made in the heat and fury of a political campaign, and the cases cited by the defendant with respect to statements so made are not applicable. The question of the meaning of the publication should have been left to the jury under a proper instruction by the court, or as the court, through Mr. Justice Bristow, says in Hotz v. Alton Telegraph Printing Co., 324 Ill. App. 1:

"It is inconceivable that any reasonable construction placed on the articles in question could lead to any other conclusion than that the defendants maliciously intended to charge the plaintiffs with public wrongs steeped in dishonesty and fraud, and that they were

515

designed to impeach the integrity and standing of the plaintiffs in their community. These publications were certainly knowingly calculated to induce an ill opinion of the plaintiffs, and to destroy their reputation in their community. Such an assault upon the good name of anyone has repeatedly been held to be libelous *per se*. Herrick v. Tribune Co., 108 Ill. App. 244, 247, 248; White v. Bourquin, 204 Ill. App. 83, 93, 94. 'Defamatory words which impute unfitness to perform the duties of an employment of profit, or want of integrity in the discharge of its duties, are actionable in themselves.' Creitz v. Bennett, 273 Ill. App. 88, 96."

 Defendant Myers urges that the rule regarding language libelous *per se,* where charging wrongful conduct or dereliction of duty, is qualified by the requirement that it must impute a dishonest or fraudulent motive or intent, and cites McDonald v. Chicago Daily News Pub. Co., 252 Ill. App. 61 (1929), and Davis v. Ferguson, 246 Ill. App. 318 (1927). In the McDonald case the court decided that the statement made concerning the alleged-neglect of duties by the plaintiff as a "special State's attorney" was not libelous *per se,* since there was no such office provided by the Illinois statutes, nor was there any charge in the declaration that the plaintiff was a practicing attorney licensed to practice in Illinois. The court, as dicta, does quote with approval Davis v. Ferguson, 246 Ill. App. 318. The Davis case was an action based upon certain allegedly libelous statements concerning a candidate for the office of sheriff made during a campaign for that office, and asserting that he had been inefficient when he had previously held the office. The court cites 36 Corpus Juris. 1168 to the effect that the wrongful conduct or dereliction of duty is not libelous *per se* unless it imputes a dishonest or fraudulent motive or interest. However, the court neglects to note that the particular section quoted from Corpus

516

Juris does not refer to statements made concerning persons holding an office. These cases have not been followed in the later cases in this court which use as a standard in determining whether a matter is libelous *per se* the definition of libel as set forth in the Illinois Criminal Code (Ill. Rev. Stat. 1959, chap. 38, par. 402), even though a civil action is being litigated, and those cases hold that an attack upon the integrity, capacity or fitness of a public official may be libelous *per se* without the necessity of showing any motive of dishonesty or fraudulent motive or interest. Cook v. East Shore Newspapers, Inc., 327 Ill. App. 559; Hotz v. Alton Telegraph Printing Co., 324 Ill. App. 1. In People v. Strauch, 247 Ill. 220, at 228, the court says:

"This article impeached the honesty, integrity, virtue and reputation of the complaining witness, and thereby exposed him to public hatred, contempt and ridicule. The court ruled properly in refusing to quash the indictment on the ground that the article was not libelous."

The two other cases cited by Myers which were decided outside of Illinois are not pertinent.

■■ ■■ With reference to the argument of the defendants that the sewer project and waterworks program were matters of public interest and subject to comment which is not actionable unless written maliciously (in support of which argument defendants place reliance upon Parmelee v. Hearst Pub. Co., Inc., 341 Ill. App. 339; Dilling v. Illinois Pub. & Prtg. Co., 340 Ill. App. 303, and Kulesza v. Chicago Daily News, Inc., 311 Ill. App. 117), this rule does not apply to false statements. In Cook v. East Shore Newspapers, Inc., 327 Ill. App. 559, at 578, the court says:

"It is the law in Illinois that publication by a newspaper of a statement of fact, which is not true, against an individual and which is libelous *per se,* is actionable and not privileged. . . . [Citing cases.]

517

"The foregoing statement of law is in no way in conflict with the right of a newspaper . . . to report matters of public interest and comment thereon, or to fairly comment on and criticize public officers and the like. However, as held in the cases cited, when a newspaper goes further than a report of proceedings and fair comment and criticism, and states as a fact that which is false and libelous *per se,* then the privilege ceases."

The court further states that the right of fair comment does not extend to a misstatement of facts, and quotes from Cooper v. Lawrence, 204 Ill. App. 261, at p. 266, where the court said: " 'The right to make and publish such reasonable comment and criticism, however, does not extend so far as to permit false statements of facts, and the subject of reasonable comment and fair criticism must be a fact and not a libel.' " In Hotz v. Alton Telegraph Printing Co., supra, the court said:

"The contention is also made that the articles are protected under the defense of 'fair comment and criticism.' Where facts are stated and they are libelous *per se,* there is no defense of 'fair comment and criticism.' Cooper v. Illinois Publishing & Printing Co., 218 Ill. App. 95, 116."

In Belt v. Tribune Co., 6 Ill.App.2d 489, the court says:

"The trial court stressed the right of a newspaper to make fair comment and criticism of the plaintiff's action in connection with the public improvement or installation referred to in the publication. It is fundamental that fair comment and criticism cannot be predicated on an unfair or false statement of facts. Cooper v. Lawrence, 204 Ill. App. 261; Cooper v. Illinois Publishing & Printing Co., 218 Ill. App. 95; Cook v. East Shore Newspapers, Inc., 327 Ill. App. 559."

All of the statements in the article were by the motions to strike admitted to have been falsely made.

518

The headlines to the articles, which are as follows: to the first article, "Ream Cites Need for Audit in Lincolnwood"; "Says Proesel Using Flood As Cover Up"; "Tells What Happened To $100,000 of Water Bond Money"; and to the second article, "For Newcomers to Lincolnwood Ream Explains Why Voters Said 'No' to Sewer Plan" add fuel to the fire and tend to support the conclusion we have reached.

■■■ It is also argued by the defendants that the articles do not apply to Proesel. That question is not before the court. It is a question of fact which must be determined by the jury. Ogren v. Rockford Star Printing Co., 288 Ill. 405, and John v. Tribune Co., 19 Ill. App.2d 547.

Both defendants argue that to hold these articles libelous would interfere with freedom of speech. Many years ago Blackstone said in his Commentaries, Book IV, chap. 11, pp. 151, 152:

"In this and the other instances which we have lately considered, where . . . scandalous libels are punished by the English law, some with a greater, others with a less, degree of severity; the *liberty of the press,* properly understood, is by no means infringed or violated. The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no previous restraint upon publications, and not in freedom from censure for criminal matter when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press; but if he publishes what is improper, mischievous, or illegal, he must take the consequence of his own temerity."

In Cook v. East Shore Newspapers, Inc., supra, the court quotes then Circuit Court Judge Taft who says, in Post Pub. Co. v. Hallam, 59 F. 530 (a case in which

it was held that where false allegations of fact were made, good faith and probable cause were no defense) :

"We are aware that public officers and candidates for public office are often corrupt, when it is impossible to make legal proof thereof, and of course it would be well if the public could be given to know, in such a case, what lies hidden by concealment and perjury from judicial investigation. But the danger that honorable and worthy men may be driven from politics and public service by allowing too great latitude in attacks upon their characters outweighs any benefit that might occasionally accrue to the public from charges of corruption that are true in fact, but are incapable of legal proof. The freedom of the press is not in danger from the enforcement of the rule we uphold. No one reading the newspaper of the present day can be impressed with the idea that statements of fact concerning public men, and charges against them, are unduly guarded or restricted; and yet the rule complained of is the law in many of the states of the Union and in England."

In Ogren v. Rockford Star Printing Co., 288 Ill. 405, at p. 417, the court says:

"But the publication of falsehood and calumny against public officers or candidates for such offices is an offense most dangerous to the people and the subject of punishment, because the people may be deceived and reject the best citizen, to their injury. An intention to serve the public good in such a case cannot authorize or justify a defamation of private character. (Rearick v. Wilcox, 81 Ill. 77; Sweeney v. Baker, 31 Am. Rep. 757; Jones v. Townsend's Admx., 58 Am. Rep. 676.) To a malicious publication of libelous matter against a candidate for public office there is no defense on the ground that it is privileged, and it is not a defense that it is mistakenly and honestly made. Such matters go only in mitigation of damages."

520

The order of the Superior Court sustaining the motions to strike and dismissing the complaint is reversed and the cause remanded for further proceedings consistent with this opinion.

Reversed and remanded.

DEMPSEY, P. J. and SCHWARTZ, J., concur.